Philip S. Harper v. Commissioner. Carolyn L. Harper v. Commissioner.
Harper v. Commissioner
Docket Nos. 660, 661.
United States Tax Court
1944 Tax Ct. Memo LEXIS 364; 3 T.C.M. (CCH) 160; T.C.M. (RIA) 44047; February 24, 1944
*364 William N. Haddad, Esq., and Earl K. Schiek, Esq., 135 S. LaSalle St., Chicago, Ill., for the petitioners. Gerald W. Brooks, Esq., for the respondent. VAN FOSSAN Memorandum Findings of Fact and Opinion The respondent determined deficiencies in income taxes for the years 1939 and 1940 of $14,793.25 and $17,629.73, respectively, against Philip S. Harper and of $8,592.56 and $13,363.59, respectively, against Carolyn L. Harper. The single issue is whether the income of certain trusts created by the petitioners is taxable to them as grantors. Findings of Fact The petitioners, Philip S. Harper and Carolyn L. Harper, are husband and wife and reside in Chicago, Illinois. Their Federal income tax returns were filed with the collector of internal revenue for the first district of Illinois. On December 31, 1938, the petitioner Philip S. Harper created a trust (known as Trust No. 1), naming himself and his wife, Carolyn L. Harper, as trustees, to which he transferred a one-fourth interest in certain patents then owned by himself and Carolyn L. Harper. On the same day, Carolyn L. Harper created a similar trust (known as Trust No. 2), naming herself and Philip S. Harper as trustees, to which *365 she transferred a one-fourth interest in the same patents. With the exception of certain minor beneficiaries designated therein, the trusts were identical. The trustees of each trust were authorized to pay so much of the net income thereof as they should from time to time determine to the minor beneficiaries. On each occasion of the birth of a grandchild of the grantor, the trustees were directed to pay the sum of $1,000 to the parents of such grandchild. The balance of the income was to be accumulated and added to the principal until a child of the grantor reached the age of 25, after which the trustees were authorized to make distributions of income thereafter accruing to such children of the grantor as had attained that age. These distributions were to be in such amounts as the trustees might in their discretion determine. Any portion of the income not so distributed was to be added to principal. The trust instruments provided that the trusts should continue until the death of the survivor of the grantor and Carolyn L. Harper [Philip S. Harper] at which time the corpus of each trust, including all accumulated income, was to be distributed to the then living children and descendants *366 of deceased children of the grantor. In the event there were no such children or descendants then living, the trust estate was to be paid to such persons as the survivor of the grantor and his wife [husband] might appoint by will, and in default of such appointment, to the grantor's heirs. The trustees were given broad powers of management over the trust estate, including the power (1) to invest and reinvest the trust property in securities, real estate or other property, "the Trustees to have as wide latitude in this respect as an individual would have if the absolute owner thereof, and not to be restricted to the investments for trustees as authorized by any statute or rule of law"; (2) to sell any or all of the trust property on such terms and conditions as they should see fit; (3) to license any and all patents and applications for letters patent on such terms as they should see fit; (4) to modify, supplement or cancel any and all agreements or interests therein for the licensing of all letters patent and applications therefor; (5) to borrow money and mortgage or pledge any trust property for any purpose deemed by them to be for the advantage of the trust estate; (6) to vote *367 any stock in person or by proxy; (7) to make distributions or divisions of the trust estate in kind and at valuations determined by them; and (8) to keep securities or other property in the name of the trustees or their nominee without disclosing their fiduciary relationship. Each trust contained the following provision: "ARTICLE V "Anything hereinabove to the contrary notwithstanding, the Grantor may modify, amend or supplement this agreement or any of the terms or provisions hereof and may change the beneficiaries who are to receive the income or the principal of the Trust Estate and may limit, modify, or definitely stipulate and fix their interests either as to income or the principal of the Trust Estate, all of which may be done at any time and from time to time prior to the death of the Grantor by an instrument in writing duly executed by the Grantor and delivered to the Trustees; provided, however, that the Grantor shall at all times be entirely without power in any manner to modify, amend or supplement this agreement or any of the trusts created hereby or at any time existing hereunder, so as to create in any manner directly or indirectly any interest of any kind or *368 nature whatsoever in the grantor or his [her] estate in or to the income from the Trust Estate created hereby or the principal thereof or to cause any part of such income or principal to be used or applied for the benefit of the Grantor or to pay any insurance premiums upon policies of insurance insuring the life of the Grantor or to revest in the Grantor or his [her] estate any right, title or interest in or to the Trust Estate or any portion thereof. The Grantor may at any time release or relinquish any or all of the powers expressed in this Article V by an instrument in writing signed by the Grantor and delivered to the Trustees or any one of them." Each trust had its own bank account, carried in the names of both trustees. Checks drawn on these accounts required the signatures of both trustees. The securities which made up the trust estates were kept in the personal safe deposit box of Philip S. Harper, but each trust was contained in a separate envelope, so labelled. The trust funds were not commingled with the personal funds of either of the petitioners. During the times herein material the petitioners had two children, both minors. After the trusts were created, the petitioners *369 continued to support their children out of their personal funds, and none of the trust income was used for that purpose. The patents owned by the Harpers and the two trusts were under license to the Harper-Wyman Company, a corporation organized in 1927, principally to manufacture and sell the patented articles, consisting of gas stove burners, valves, lighters, and other accessories. Philip S. Harper was president of the company, receiving a salary of 4 per cent of the gross sales together with a fixed monthly allowance of $225, amounting to $44,737.51 in 1939 and $49,009.96 in 1940. The petitioners owned 86 per cent of the stock of the company. Royalties were paid to the owners of the patents by the Harper-Wyman Company in the following amounts: 1930
$ 5,274.83
1931
6,369.60
1932
2,944.44
1933
12,075.45
1934
20,674.34
1935
47,729.15
1936
65,254.48
1937
$103,455.72
1938
78,674.29
1939
116,249.76
1940
109,646.60
At the time the trusts were created, the petitioners were each worth between $50,000 and $10,000, exclusive of the value of the property transferred to the trusts. The petitioners named themselves trustees of the trusts because they considered themselves *370 best able to handle the patents which constituted the trust estates. Philip S. Harper had no confidence in corporate trust companies because of some unfortunate experiences he had had with them, and the petitioners knew of no individuals whom they thought were sufficiently competent or financially responsible to manage the trusts. Philip S. Harper had managed other trusts and at the time was trustee of two trusts for the benefit of other members of his family, and hence the petitioners decided to name themselves as trustees. The petitioners' principal motive in creating the trusts was to provide for their children. They were conscious of the fact that a saving in taxes would result, but tax avoidance was not their main motive. The Harper-Wyman Company had grown rapidly and was often in need of additional working capital, which the petitioners usually advanced to it from their personal funds. The sums so advanced had always been repaid, but the petitioners were fearful that at some time the company might fail, taking with it their personal fortunes and leaving themselves and their family in need. It was to prevent such an occurrence that the trusts were created. On September 25, *371 1941, the petitioners resigned as trustees of the trusts, and the Harris Trust and Savings Bank was appointed trustee in their place. On September 26, 1941, each petitioner amended his trust agreement by making certain minor changes in the interests of the beneficiaries and by striking out Article V and inserting in lieu thereof the following: "The trust created under the terms of this Agreement shall be irrevocable." The petitioners did not file gift tax returns for 1938, but did file such returns in 1941, after executing the above amendments to their trust agreements. In 1939 and 1940 the two trusts received the following income 1939
1940
Trust No. 1
$29,162.44
$28,901.65
Trust No. 2
29,062.44
28,655.35
During the same years the following amounts were distributed by the trustees to the minor beneficiaries of the trusts: 1939
1940
Trust No. 1
$2,200.00
$2,550.00
Trust No. 2
1,880.00
1,971.00
The balance of the income in each case was accumulated and added to principal in accordance with the terms of the trust agreements. Income tax returns were filed for each trust for 1939 and 1940 in which the undistributed income was reported as taxable *372 to the trustees, and the income taxes thereon were paid by the trustees. The respondent determined that the entire income of the trusts was taxable to the petitioners as grantors, and assessed deficiencies accordingly. Opinion VAN FOSSAN, Judge: The single issue presented is whether the income of the two trusts for the years 1939 and 1940 is taxable to the petitioners, the grantors of the trusts. The petitioners contend that in creating the trusts they divested themselves of all ownership and control over the trust properties and that after the trusts were created they had no opportunity to benefit from the trust properties, either immediately or at some future time. The respondent contends that the petitioners retained such control over the trust properties as to be virtually the owners thereof, and that the income of the properties is taxable to the petitioners under section 22(a). There is no dearth of precedent to guide us in reaching a conclusion. In a long line of cases, stemming from , the courts have been called upon to consider trusts such as the ones before us and to determine their effect for tax purposes. *373 While these decisions are helpful, we must, nevertheless, remember that each case rests primarily upon its own facts. "A fact may be vital in the background of one case and of small importance in another situation." . We shall not attempt to distinguish all the decided cases, therefore, but shall refer only to those which are necessary and helpful in disposing of the issue before us. The petitioners are husband and wife. Each of them created a separate trust, naming himself or herself and spouse as trustees. The principal beneficiaries of each trust were the two minor children of the petitioners. There was present, therefore, the "intimate family group" described in the Clifford case, supra. Under the terms of the trust instruments, the trustees were directed to accumulate the income of the trusts until the children reached the age of 25, after which the income was to be paid to them in the uncontrolled discretion of the trustees. The trustees were given broad powers of management over the trust properties, "to have as wide latitude in this respect as an individual would have if the absolute owner thereof," *374 and they were not to be restricted to legal investments for trustees. Each grantor specifically reserved the right to alter or amend any of the terms of the trust agreement; to change the beneficiaries who were to receive the income or principal of the trust estate; and to limit, modify or definitely stipulate and fix their interests either as to income or the principal of the trust estate. It is difficult to perceive what further control the petitioners could have retained over the income and principal of the trusts, except the power to use them for their own benefit. As was the case in , which this case resembles, each petitioner has "unlimited power, at any moment to reduce or obliterate the share of principal or interest originally allotted to * * * any child, if for any reason, or for no reason, he decides, in the exercise of his uncontrolled discretion, that any of the beneficiaries is receiving more than is desirable." The petitioners were people of ample means. In addition to the property placed in trust, each was worth between $50,000 and $100,000. Their royalties from the patents for 1939 amounted to *375 $58,124.88. In the same year Philip S. Harper received a salary from the Harper-Wyman Company of $44,737.51. It is thus apparent that their income was in excess of their normal needs. "To a person of ample means the right to say who shall receive property and income may be a more important attribute of ownership than the right to use them for his own well-being." . The petitioners testified at the hearing that they did not believe that Article V of the trust instruments gave them the power to change the beneficiaries. They stated it to be their understanding and intention that they retained the power only to adjust the distribution of the trust income and principal between their children; that one was "frail and sickly"and might be more in need of money than the other, and that this article was inserted to give them the power to make necessary adjustments. We find no such limitation in the trust instruments themselves. The language contained therein is plain and unambiguous and gives the petitioners full power to change the beneficiaries in any manner, with the single exception that any change so made shall not inure to the *376 benefit of the grantors, directly or indirectly. The plain words of the trust instrument can not be contradicted by parol testimony of the petitioners. It is to be assumed that the trust instruments were drawn in accordance with the petitioners' instructions and that they correctly reflect their intentions. , and cases there cited. Furthermore, such a contention on the part of the petitioners is not wholly consistent with the admission made by Harper at the hearing that "* * * I could do more than allocate it between the beneficiaries. I could cut out one of them and give it all to the other one." The petitioners have called our attention to numerous cases which they claim support their contention. We have carefully examined the cases cited and do not find that they support petitioners' contentions on the facts here present. The cases at bar are not unlike that of . There the settlor retained the power to modify the trust. She could increase the principal; she could change both the beneficiaries and the proportion of the income payable to any beneficiary *377 except that such changes could not be for the benefit or use of the settlor; she could substitute trustees; and she could control the disposition of the corpus after her death by will. The court held that "* * * a settlor who is a person of means and who can control the spending of a fund, which she has set up, in every respect except spending it for herself is sufficiently the 'owner' of the fund to make its income taxable to her under section 22(a)." It follows that the petitioners continued to be the owners of the trust property after the creation of the trusts within the scope of , and , and that they are taxable upon the income of the trusts under section 22(a). Decisions will be entered for the respondent.